[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceedings
Danual D. was more than five years old on February 8, 1996 CT Page 4240 when the Department of Children and Youth Services (DCF) filed this petition seeking to terminate the parental rights of Lisa D. and Leeroy H., his mother and acknowledged father, after nearly two years in the custody of the Commissioner of DCF After securing an updated psychological evaluation by the clinician who had evaluated the family two years earlier, trial began on September 19, 1996. A motion to amend the pleadings, filed by the petitioner a week before trial and presented to the court on the first day of trial — more than seven months after the action was initiated — was denied for being untimely filed, the updated events contained therein being regarded as addenda (Petitioner's Exh. G) to the originally filed social history. (Petitioner's Exh. F) as mandated by law. Conn. Gen. Stats. Sec. 17a-112 (e) (Rev. 1995). The adjudicatory date thus remains February 8, 1996, the original filing date. Practice Book, Sec. 1042.1(4).
After five nonconsecutive trial days concluding on December 18, 1996, the parties rested and were given until January 25, 1997 for the submission of trial memoranda and corrections thereto. The dispositional date is, therefore, December 18, 1996 and the period decision was reserved began January 25, 1997.
Facts
Evidence offered at trial, interpreted in the light of the prior record in this court concerning not only this child but also his two older half-siblings, children of Lisa D.,[1]
supports the finding of the following factual chronology:
Danual was born on 10/29/90, the third out-of-wedlock child born to his then 24-year-old mildly retarded mother. None of the children share a common paternity. By her own admission, Lisa had used drugs during her first two pregnancies (marijuana with Michelle; cocaine with Zabian). Zabian's father, with whom she lived briefly in 1989, was abusive toward Michelle as well as toward herself. Shortly after ending her relationship with him in late 1989, she began living with Leeroy H., becoming pregnant with Danual at the same time that Michelle and Zabian were taken into DCF custody following confirmation of physical abuse of both children (multiple unexplained fractures of differing ages; bruises; burns), presumably inflicted by Leeroy and from which Lisa appeared incapable of providing protection. (Petitioner's Exh. F, p. 2-3) Following a trial, these two children were adjudicated neglected and abused and committed to DCF. Less than three months later, Danual was born. CT Page 4241
When Danual was nine months old, DCF filed petitions seeking termination of parental rights of the two older children. Soon after initiating those petitions, DCF filed a petition alleging Danual to have been neglected by reason of two episodes of physical abuse by Leeroy (a slapped face in May of 1991; a plastic ball thrown at his face, causing a bruise, two months later). The pending petitions on the three children were heard jointly. After presenting its evidence on the two incidents alleged to be grounds for finding Danual to be neglected, the petitioner moved to amend the pleadings to add a wholly new allegation of neglect: Failure to thrive. When this motion was denied as untimely filed, but without prejudice to be pleaded in a later action, the respondent parents moved to dismiss for failure to have established a prima facie case of neglect, as of the adjudicatory date of 7/26/91. The motion was granted.
DCF did not initiate another petition alleging failure to thrive, or any other kind of neglect of Danual, for the next two years. Leeroy was incarcerated for ten months of this period. Upon his release, despite the permanent loss of her two older children because of abuse by Leeroy, Lisa resumed her relationship with him. At one time during this period, she moved to New Haven in an effort to be free of his mistreatment of her, but, soon after, returned to Bridgeport to resume cohabiting with him in the home of various relatives.
She and Leeroy and their son, Danual, were living with Leeroy's father when the police were called on April 8, 1994 in response to a report of domestic violence. Upon arrival at 2 a.m., both parents were found to be under the influence of one or more substances, and were required to leave the paternal grandfather's home. Leeroy took himself to the home of another relative, but Lisa had no place to go, so the child was placed on an emergency basis with DCF which soon after filed a neglect petition and secured an order of temporary custody.
Leeroy visited Danual twice in foster care in the first month of his placement. (Testimony of Mary Corcoran.) A month later, in May of 1994, Leeroy was arrested for the stabbing death of an unrelated ten-year-old girl. He has remained incarcerated since that time and requested no prison visit until January 1996, one month before the instant petition was filed. By the time this trial began, Leeroy had been convicted and sentenced to a prison term of 60 years without parole, with a firm release date of 2054 CT Page 4242 when Danual will be 64 years old. (Testimony of Corrections Department Records Specialist Broadbrook.)
In his first three months as a foster child, Danual had as many placements: First he was placed with the maternal great-aunt who had raised Lisa (Lisa's mother having given birth to her while at Fairfield Hills Hospital) whom Lisa regarded as her own mother. After seven weeks the aunt asked for his removal because of his uncontrollable behavior: Enuresis, encopresis, smearing feces, swearing, and overtly sexualized acting out. Two subsequent unrelated foster homes requested his removal in a matter of days. An inpatient assessment at St. Raphael Hospital in July of 1994 resulted in a diagnosis that this behavior was a response to extreme, severe psycho-social stressors: Witness to domestic violence against his mother, abuse of his siblings and the subsequent incarceration of his father. In the months following, DCF attempted to follow the hospital's recommendation to secure a therapeutic foster home combined with outpatient services. Two therapeutic foster homes were found, but both requested his removal because of his continued disturbed behaviors. After another inpatient psychiatric hospitalization, he was finally placed at Riverview Hospital on October 20, 1995 where he has remained through the conclusion of this trial. After more than a year at Riverview, his principal diagnosis is Post Traumatic Stress Syndrome (PTSS) resulting from the significant trauma experienced when living with his parents, much of which could have occurred even before he became verbal. (Petitioner's Exh. F., p. 5)
After Leroy's incarceration, Lisa became involved with at least one other abusive boy friend. In testifying on her own behalf, she denied that a William S. was a "boy friend," although at one time she had arranged for her Social Security benefits to be paid to him as representative payee. She admitted that he had beaten her, but said this had only happened once, in November of 1995, after which she broke up with him. She did not explain the source of the visible injuries on her face noted by Danual's clinicians during visits of March and April of 1996. See infra.
Clinical Assessments
Two members of Danual's Riverview treatment team testified as to Danual's references to his father and the behaviors sought to be corrected by the hospital program. According to Lynn Johnson, his first shift counselor since admission, Danual speaks of his CT Page 4243 father in group meetings, disclosing that he is in jail and expressing fear that he will get out and hurt him. He recognizes his mother on visits but tells the group that she cannot take care of him, that he is not "safe" with her. Among his special needs, Ms. Johnson named his anxiety, nightmares, temper tantrums, aggressive behavior, and "unacceptable" sexualized gestures, comments and self-exposure.
Cathleen Sawyer, Danual's primary clinician, qualified as an expert witness (Petitioner's Exh. D), testified that Lisa came to visit the first month Danual was placed at Riverview but was not permitted to see him since she was exhibiting extensive bruises from a recent beating at the hands of Mr. S. Lisa appeared unable to understand why she could not see him in that condition. The following month she was permitted to visit even though her face still showed scars which upset her "parentified" son. In apparent ignorance or indifference to his fear of bathrooms — he frequently asks his therapist if there are any "bad boys' or "home boys" in the bathroom — Lisa took Danual, during that first visit, into the bathroom and closed the door. Following that visit, the child had nightmares, displayed anxiety, acted out of control and reenacted past trauma using a guttural voice to utter adult swearing with sexual references. Despite appearing on two other visits with visible signs of having been abused (a burn in March of 1996; a bleeding cut the following month), Lisa was permitted to visit every month until October of 1996 when all visits were suspended during a planned transition into another therapeutic foster home.
In the security of his treatment at Riverview, Danual began to permit the staff glimpses into what his life must have been during his three and a half years with his parents: Calling himself, his mother and his father "bad," he has stated to Ms Sawyer, "My father has hurt two people in my home," and "All Daddies should die." He is aware that his father is in jail for murdering a child, though the source of his information is unknown, and he often expresses concern that his father will get out of jail and hurt him. Loud noises startle him, and when he hears one he will say that he fears "a bad man" is coming to get him, and on one occasion said "Danual is dead. Daddy [or Leeroy] kills me." He is preoccupied with locks and keeps looking out of windows to see if his father is there, saying "Daddy [or Leeroy] got out of jail." He associates the sound of sirens with his father going to jail for killing someone, and thinks that his father will come and kill him, too. CT Page 4244
When the father requested prison visits in January of 1996, for the first time since May of 1994, the Riverview treatment team strongly recommended against it. Such an encounter, according to Ms Sawyer, would only "terrify him" and would therefore be counter indicated in the "most severe case of Post Traumatic Stress Syndrome" that Ms Sawyer had ever seen. In his case, the PTSS resulted from physical abuse of others that Danual witnessed as well as suffered himself, and, she "strongly
suspected", sexual abuse as well, based upon the nature of his sexual acting out: Displaying himself, simulating intercourse, pretending Ms Sawyer is his "wife" so they can hug and kiss.
From observing Lisa's visits every month for a year, Ms. Sawyer has concluded that while she says and thinks that she understands his needs and can take care of him, in fact it is all Lisa can do to meet her own needs. Danual's needs, which the therapist termed "intense" and "severe", are not understood by the mother and cannot be met by her. Ms Sawyer saw no benefit to Danual's continued contact with either parent. He is terrified of his father and would suffer "severe deterioration" if compelled to visit him in prison. He is confused by his mother's statements to him, made at different times, that she will be taking him home with her, or that she will never be taking him home. Both remarks, made against the therapist's specific advice, were disturbing to the child.
Lisa was offered no formal family therapy since she appeared to Ms Sawyer to be in "very poor condition" and in need of services for herself before any kind of family therapy would be "appropriate and helpful." Where a parent has herself been visibly abused on a number of occasions, and her child has severe symptoms which must be addressed, reunification of parent and child must be "a more remote goal" than meeting the immediate needs of both parent and child.
Ms Sawyer concluded that the prognosis for Danual, even after a year of residential treatment in a psychiatric inpatient hospital, was guarded, but she was hopeful for him if he could be placed in the right environment.
Clinical psychologist Carol Swenson evaluated Danual and his mother in July of 1994 (Petitioner's Exh. A) and again in June of 1996 (Petitioner's Exh. B). In the earlier interview, just three months after his removal from home, Dr. Swenson saw ". . . no affection or physical contact between" mother and child, despite CT Page 4245 weekly visits since his removal. She found their relationship "troublesome in relation to the lack of warmth and bonding and his clear dominance over her" (Exh. A, p. 5.) She saw Danual as brighter and more self-confident than his mother and imitative of his father's abusive behavior toward her, all of which "contributes to his dominance over her." She concluded, in July of 1994:
 "Mrs. D. Is not intellectually or characterologically equipped to provide the limits, structure and psychological security that this large, strong-willed and competent boy requires. His behavior would, over an extended period in which she was responsible for him, create, in all probability, stressors and problems which she would be unable to adequately deal with." (Id, p. 6.)
Two years later, reporting that she had not used alcohol "for several months" (in July of 1994, she had told Dr. Swenson she had had her last drink in May of 1994), Lisa's "modestly higher" testing was likely ascribable to her "relative abstinence" from alcohol. But the evaluator did not find that her improved scores were statistically significant, Lisa continuing to test in "the very low end of the Borderline range of intellectual abilities." (Petitioner's Exh. B, p. 2). Her lowest scores were on tasks "calling for common sense and judgment and an ability to learn from experience." (Id. P. 3.) Surprisingly, she revealed to the evaluator that "she hopes to regain custody of her two older children," in apparent disregard of the fact that she had vigorously defended against the petitions to terminate her parental rights in those children and that a full trial had resulted in an adverse judgment rendered more than five years earlier (April of 1992). In their interaction session, Danual "showed no interest in interacting with his mother . . . repeatedly saying that he wanted to leave." (Id., p. 4.) Dr. Swenson summarized their relationship:
 [They] have an extremely limited and distant relationship. Danual does not appear to have any bonding connections with his mother and is fearful of her . . . probably more through an association with her and contact with his abusive father than any direct abuse she has contributed to. It is also unlikely that he has experienced any particularly positive experiences in relation to his mother that would counteract the associations of fear with his father . . . [She] has little concept of the basic needs of children and no CT Page 4246 understanding of Danual's profound needs. She expressed a willingness to use parenting services but as a perfunctory gesture . . . [Her] intellectual limitations significantly impair her judgment and capacity to discharge parenting responsibilities or to adequately form an empathic bond with Danual. (Id. P. 5.) . . . It is not in Danual's best interests to prolong temporary placements. Mrs. D. is not, currently, capable of providing the care that Danual needs. It is highly unlikely that she will be more capable in the future. (Id. P. 6.)
Reasonable efforts
The same social worker, Mary Corcoran, was assigned to the case from the outset, in April of 1994. Lisa complied marginally with all of the expectations articulated at the time Danual was committed in August of 1994. She never completed any of the recommended drug and alcohol assessments, but the petitioner offered no evidence to counter her own statement to Dr. Swenson that she has stopped drinking in early 1996. While her cooperation with the Department of Mental Retardation worker, Dottie Grant, improved in attendance in the months prior to this trial, she did not appear able to incorporate what she was repeatedly taught, so that she continues to be unable to function on her own with regard to budgeting, transportation to appointments, and other matters with which she received such help on an ongoing basis: She still needs help with her budget, still has a representative payee of her Social Security income, still needs to be driven to appointments. DCF assisted with transportation and attempted to involve Lisa in drug programs, but without any long term follow through on Lisa's part. Family therapy would have been available at Riverview had the therapists there deemed involvement of the mother appropriate. Mary Corcoran testified that she had not wanted to ask too much of the mother, regarding cooperation with DMR and substance abuse treatment, as well as regular visitation, as the essential first steps toward the original permanency plan of reunification.
Reunification with his mother was the original permanency goal of DCF for Danual, but the revelation of the trauma he suffered prior to placement and the resulting diagnosis of PTSS rendered that goal unobtainable. Lisa's intellectual limitations, repeated pattern of selecting abusive men as companions, difficulty in discussing past abuse combined with the demands that Danual's extrordinary emotional needs make, and will CT Page 4247 continue to make, of any caretaker necessitated seeking permanency elsewhere than with his biological mother.
Adjudication — on facts as of 2/8/96.
As to the mother:
The petitioner has established by clear and convincing evidence two of the three grounds pleaded for terminating her parental rights. The third ground, lack of ongoing parent-child relationship as defined in Sec. 17a-112, subsection (c) would appear to exist as well, given the plain meaning of that subsection, but for the interpretation given that language in the Supreme and Appellate Courts. In Re Jessica M., 217 Conn. 458, (1991); In Re Valerie D. 234 Conn. 492, (1992); In Re Kelly S.,29 Conn. App. 600, (199 2). Since Danual recognizes his mother, appears to look forward to her visits and apparently does not respond to them entirely negatively, this ground must bedismissed.
The other two non-consensual grounds for terminating Lisa's parental rights, however, are supported by clear and convincing proof:
I. Failure to rehabilitate. In the nearly two years between Danual's removal from home on April 8, 1994 and the adjudicatory date of this petition, February 8, 1996, Lisa appears to have made minimal gains in her ability to care for herself, and none in her ability to understand or meet the extraordinary needs of her son. All of the claimed improvements in her situation — elimination of relationships with abusive men, sustained sobriety, improved cooperation with assistance offered by DMR, the securing of her own apartment rather than living on the largesse of others — post-date the adjudicatory date of this petition: She told Dr. Swenson in June of 1996 that she had used alcohol as recently as "several months" before the evaluation, permitting the inference that she was still drinking at the time of the adjudicatory date. Her DMR worker testified in December of 1996 that her sporadic cooperation with planned visits had improved in the past few months — again presumably starting such improvement at or after the adjudicatory date. Lisa admitted not understanding Danual's diagnosis of PTSS, but stated her intention of reading up about it at the library, not explaining how this could be done when the DMR worker testified she was unable to read. She testified that she was through with abusive CT Page 4248 boyfriends, having separated from the admittedly violent Mr. S. soon after her beating of November 1995, but she could not explain the source of the bruising noted by Ms Sawyer during visits in March and April of 1996, after the adjudicatory date of this petition. The conclusion is inescapable that as of February 8, 1996, Lisa had "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." [Emphasis added.] Even if this petition had been filed at the outset of the trial, seven months after the actual filing date, whatever personal rehabilitation Lisa may have achieved in her own functioning did not appear to have improved her ability to comprehend the extent of the psychological damage that had been done to her son, or the kind of treatment and care that his diagnosis required. Rehabilitation must be regarded in terms of a parent's ability to recognize and effectively meet the needs of the particular child at issue, "considering . . . [his] age and needs"; personal rehabilitation that relates only to ability to meet the needs of the parent herself, or the needs of some theoretical child who may not have the extraordinary needs of a child with a diagnosis of PTSS, cannot support the conclusion that this parent could, within a reasonable time considering the age and needs of this particular child, assume any responsible position in his life.
2. Acts of commission or omission. While DCF has been responsible for meeting all of Danual's needs since April of 1994, and nothing was either pleaded or proven that could support the conclusion that any of those needs had not been adequately met since that date, this ground is available to the court when facts unknown to the court at the time of a child's initial placement become known only after commitment. In this case, Danual was initially placed because his parents both had substance abuse problems and were homeless. The sole adjudication made on August 24, 1994 was that Danual was an uncared-for child, based upon both the homelessness of his parents and their inability, given their substance abuse problems, to meet the specialized needs of a four-year-old child.
After being placed, however, Danual's behavior began to throw a shadow on the past that, in time, fully revealed the kind of care he had received when living with his parents: Witness to the physical abuse of his mother and half-siblings; recipient of physical, and probably sexual, abuse while his parents were his CT Page 4249 custodians, this child's response, after removal from his parents' home, was diagnosed as the most severe case of PTSS that his primary therapist at Riverview had ever seen. The emotional toll that the conditions in his home had taken of him before being removed to foster care had been unknown to DCF when the original neglect petition that led to his commitment was filed on February 8, 1994, and to the court when the child was committed to the custody and guardianship of DCF six months later. Had the full extent of the psychic damage to Danual been known to DCF in February of 1994, a co-terminous petition seeking not only an adjudication of abuse but also termination of his parents' rights on this ground could have been sought and, if established on the dispositional date, granted by the court. DCF thus did not elect to seek only the commitment of the child and eventual reunification with his mother in full knowledge of the damage that had been done to him while living with both parents. It sought commitment and eventual reunification on the facts then known — substance abuse and homelessness — both of which were presumably amenable to appropriate treatment. By the time this termination petition was filed, however, the full extent of the damage to Danual from his father's abuse and his mother's inability to protect him from it while living with them constitutes clear and convincing evidence that while still living with his parents prior to April of 1994, Danual "had been denied by . . . acts of parental . . . omission [his mother's inability to insulate him from abuse by the father] the care, guidance or control necessary for his physical, education, moral or emotional well being." See In Re Felicia D., 35 Conn. App. 490 (1994).
As to the father:
The petitioner has provided clear and convincing proof that all four nonconsensual statutory grounds pleaded exist to terminate Leeroy's parental rights.
1. Abandonment. While there was conflicting testimony as to whether or not Leeroy had written letters to his son from prison during 1996, no evidence was offered to rebut the petitioner's evidence that Leeroy made no attempt to contact Danual or his legal custodian between his arrest for murder in May of 1994 and January of 1996, one month before initiation of this action in February of 1996. This constitutes not only abandonment in the statutory sense of a failure ". . . to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child . . ." but also in the more stringent sense of CT Page 4250 common-law abandonment. While incarceration alone is not grounds to terminate a parent's rights, it is also not a shield against a finding of abandonment. In Re Michael M., 29 Conn. App. 112
(1992). Efforts made by the father after initiation of this termination proceeding may be considered for disposition but do nothing to rebut the overwhelming proof of abandonment for a period of more than 12 months. Further, when a parent who initially has the right to visit his committed child and to work for reunification with him deliberately commits an act that effectively removes him from the child's life for decades, such parent can be fairly regarded as having abandoned that child, not in the common-law sense of intentional abandonment, but in the statutory sense defined in the termination statute. When Leeroy killed a child a month after Danual's initial placement in temporary custody in 1994, he set in motion a series of events (his arrest, incarceration and subsequent conviction) that from Danual's point of view constituted removal from his life for 60 years.
2. Failure to rehabilitate. When Danual was removed from his parents' custody, they were homeless. The securing of housing was listed as one of the expectations for the child's return to parental custody at the time of his commitment in August of 1994. By this time, Leeroy's tendency to inflict physical abuse on children had culminated in his murder of an unrelated little girl which resulted in his being continuously incarcerated ever since. No other evidence is required to support the conclusion that this constitutes clear and convincing evidence of his failure ". . . to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child,. . . [he] could assume a responsible position in the life of the child." It is not reasonable to require Danual, even without considering his extraordinary emotional needs resulting from the abuse suffered during his life with his parents, to wait until he is 64 years old for his father to be released from his present sentence.
3. Acts of commission or omission. It has long been settled that the statutory grounds to terminate a parent's rights do not have to postdate a child's commitment to DCF In Re Saba P.,13 Conn. App. 605, Cert. Denied 207 Conn. 811 (1988). Danual's diagnosis of PTSS and his many statements to Riverview staff after his placement there in October of 1995 about fearing violence at the hands of his father provide clear and convincing proof that he "has been denied, by reason of . . . acts of parental CT Page 4251 commission . . . the care, guidance or control necessary for his physical, educational, moral or emotional well-being." While this ground to terminate Lisa's parental rights was based on her acts of omission — her failure to insulate or protect her son from repeated acts of violence by the father — in the case of Leeroy, these were clearly acts of commission resulting in the severe and extreme emotional damage testified to by two unrefuted qualified expert witnesses, Dr. Swenson and Ms Sawyer. The diagnosis of PTSS, in the degree of severity suffered by Danual, casts a spotlight into his past when the parental acts which caused this condition were committed, acts which were not known by DCF or the court when Danual was adjudicated to be an uncared-for child, not a neglected one.
4. No ongoing parent-child relationship. While appellate tribunals have placed a highly restrictive interpretation on this (once known as "no fault") ground to terminate parental rights, it is still viable in cases where the child has no memory of, or feelings for, a parent, or where the only memories or feelings are negative. The latter is the situation here: Danual has nightmares about his father escaping from jail and coming to get him; he fears his father will kill or hurt him, as he hurt his half-siblings in his early childhood and, as he was told, as he killed a child for whose murder he is currently incarcerated. What is left of his memories of his father is the stuff of nightmares. There is nothing but fear left in his feelings for his father. The clinical evidence in this case supports by clear and convincing evidence this ground to terminate the parental rights of Leeroy H.
There are thus found to be two statutory grounds for terminating the parental rights of Lisa D., and four for terminating the parental rights of Leeroy H. in their child, Danual D.
Disposition — on facts as of 12/18/96
In the ten months that elapsed between the adjudicatory and dispositional dates, nothing has essentially altered the ability of either parent to care for this damaged child, or the child's need for an extraordinary degree of sensitive and informed caretaking. Leeroy has been sentenced with an estimated release date in 2054. Lisa claims to have stopped drinking — again — and there was no evidence to rebut her contention that she is no longer currently involved with abusive men. She has secured CT Page 4252 housing of her own and has improved her cooperation with her DMR worker. While these improvements suggest that some child might be entrusted to her care some day, they do not rebut the unrefuted testimony of two expert witnesses that Danual is that theoretical child. Danual needs a specialized therapeutic foster home as soon as he can handle one if he is ever able to leave psychiatric institutionalization. Lisa lacks any real understanding of his condition or of his special needs. Indeed, despite the improvements in her personal situation, she remains without employment, her Social Security checks still being sent to a representative payee, still in need of one-to-one help with the basics of daily living. The unrebutted testimony of qualified clinical witnesses called by the petitioner provides clear and convincing evidence that termination of parental rights of both of these parents — the one who actively abused and the one who passively permitted the abuse — is in the best interests of this child.
Mandated findings.
Before disposition can be entered in a termination case, the court must consider and make specific findings on the seven considerations set out in subsection (d) of Sec. 17a-112:
1. No services can be offered to a parent who is charged with murder a month after his child is placed in temporary custody, and who has been continuously incarcerated thereafter.
 All available appropriate services were offered to Lisa for years before Danual was born (in connection with her two older children) and renewed during the nearly two years between his placement in DCF custody and initiation of this action. Offering family therapy to a parent who is intellectually limited, involved in abusive relationships, intermittently addicted to alcohol and incapable of providing the extraordinary degree of care that Danual's diagnosis requires would be an empty exercise in futility for all participants.
2. DCF made reasonable efforts to reunify Danual with his mother, and with his father prior to his arrest for homicide in May of 1994. No such efforts can be made for a parent incarcerated for a period longer than his child's minority. Further, a month before this petition was filed, this court (Melville, J.) made a finding that continued efforts to reunify this family were no longer appropriate. CT Page 4253
3. No court orders were entered into in this case except for cooperation with psychological evaluations with which the parents complied. Expectations articulated by the court on 8/24/94 as guidelines for reunification of Danual with his mother were complied with marginally but without her achieving the necessary degree of understanding of his problems and special caretaking needs to permit her to resume his care. Cooperation by Leeroy was rendered impossible when he was arrested for homicide three months before the child was committed to the guardianship of DCF.
4. By December of 1996, Danual's emotional tie with his mother was a conflicted and troubled one; with his father a wholly negative and frightening one.
5. On the dispositional date, Danual was more than six years old. He was four and a half when removed from his parents' custody. In the opinion of his principal therapist and of the psychological evaluator who saw him in 1994 and again in 1996, he is still young enough to be able to make a healthy emotional bond with a family provided that it is specialized in the kind of caregiving that his diagnosed condition requires. Waiting any longer to initiate an attempt to place him with such a family could only work to his detriment.
6. Lisa has made sporadic attempts to adjust her circumstances, conduct or conditions to make it in Danual's best interests to return to her care, but most of these efforts occurred between the filing of this termination petition and the dispositional date, and even these fall far short of rendering her able, despite the best of intentions, to meet his emotional needs. Leeroy, by killing a child a month after Danual's custody was first assumed by DCF rendered himself powerless to adjust his circumstances to the end of reunification with his son for the next sixty years.
7. Neither parent was prevented from maintaining a meaningful relationship with the child by economic circumstances or the unreasonable act or conduct of any other person. Lisa was hampered by having been a passive participant to years of abuse while Danual was living with his parents, and by lacking the capacity to understand the full extent of the impact of that abuse upon the child. Leeroy was hampered only by a propensity to violence which led to the termination of Lisa's parental rights in her two older children, the traumatization of his CT Page 4254 own son and, ultimately, to his incarceration for a minimum of sixty years for the murder of someone else's child.
Judgment
Having considered the foregoing, it is found by clear and convincing evidence that it is in Danual's best interests for the parental rights of both Lisa and Leeroy to be terminated, At best, this will be a first step toward his adoption in a permanent home by caretakers who understand and know how to deal with his complex emotional needs. At the least, such termination will mark a closure with his biological parents in whose care he suffered the extreme psychological damage that has been diagnosed as PTSS.
Therefore it is ORDERED that the parental rights of Lisa D. and Leeroy H. in and to their son Danual D. be, and hereby are,terminated. And it is further ORDERED that the Commissioner of DCF be appointed Statutory Parent for the purpose of implementing a permanency plan for the child within a reasonable period, and to secure this end it is further ORDERED that the said Commissioner shall file within 90 days of the date of this judgment a written report as to the progress toward such a plan. If an adoption is not finalized by one year from the date of this judgment, the said Commissioner is further ORDERED to file a Motion to Review Plan for Terminated Child to be heard no later than fifteen months from the date of this judgment, in conformance with state and federal law.
Entered at Bridgeport this 2nd day of April, 1997
Frederica S. Brenneman, Judge