MEMORANDUM OF DECISION
On April 12, 1999, the Department of Children and Families ("DCF" or "petitioner") filed a petition to terminate the parental rights of T.W., mother, and an unnamed father, styled as "John Doe," to their child, Michael W. (the "petition"). Subsequent to the filing of the petition, the mother provided the name of a putative father, Aaron L., who was added as a party and served with process by publication. Trial concerning the petition was held on June 8 — 9, 2000. For the reasons stated below, the court grants the petition.
FACTS
The court finds the following facts and credits the following evidence, except as noted.
A. Background of The Case
Michael was born on October 22, 1993. On September 18, 1996, a petition was filed with the Superior Court for Juvenile Matters alleging that Michael was neglected. Presenting issues involved mother's arrest for violation of probation,[2] her substance abuse, and Michael's suffering from a serious case of eczema, for which proper medical care had not been sought. The court issued an order of temporary custody ("OTC") on September 25, 1996,[3] and Michael was placed in DCF's care and custody, where he remained until trial.
On February 9, 1998, the court adjudicated Michael as uncared for, finding he was homeless, and committed his custody to DCF.[4] On the same date, Expectations of the court were issued ("Expectations"). Exh. 2. These included: (1) keep all appointments set by or with DCF; keep CT Page 7380 whereabouts known to DCF or to your attorney; (2) visit the child as often as DCF permits; (3) participate in drug/alcohol counseling: successfully complete . . . out-patient drug treatment as recommended; (4) no substance abuse or use; (5) no involvement with criminal justice system; and (6) complete court-ordered psychological evaluation and comply with recommendations when requested. This court order included a "Notice To Parents" which stated, in pertinent part, "[f]ailure to achieve these goals will increase the chance that a petition may be filed to terminate your parental rights permanently so that your child may be placed in adoption." Id. The Expectations were signed by T.W. Id.
On January 11, 1999, Michael's commitment was extended and the court found that continuing efforts to reunify Michael with his mother were not appropriate, due to the fact that T.W. had failed to comply with a court-ordered psychological evaluation and parent-child interaction. Michael's commitment was subsequently extended thereafter.
On August 30, 1999, the court found that Aaron L. had been provided with notice of the proceedings by publication and entered a default as to him. The court's file contains an affidavit, dated August 6, 1999, reflecting DCF's diligent search for him.
T.W. has counsel who represented her at trial. Although this matter had been scheduled for trial several weeks in advance and although she was aware of the dates, and had been released from prison, she did not appear on either trial date. On the first day of trial, when her counsel indicated that she intended to appear, the court afforded her more time to appear, until 2:00 p.m., although trial had been scheduled to commence at 10:00 a.m. Since petitioner had two non-DCF employee witnesses scheduled and available to testify, and since mother did not appear at 2:00 p.m., testimony was begun at that time. In view of her failure to appear at trial on either day, the court enters a default as to T.W.
B. The Mother
T.W. was born in Norwalk, Connecticut in 1962. After graduating from high school in 1980, she attended college in New York City, but left short of graduation to begin employment. In 1991, she moved to Georgia, to obtain new employment, and became involved with Michael's father, whom she refused to name until after the filing of the petition. According to T.W., he was an abusive person who encouraged her to use drugs. She admitted to using illegal substances while pregnant with Michael. Michael was born prematurely, weighing two pounds, ten ounces.
T.W. reportedly returned to Norwalk with Michael in February, 1995. T.W. reported that she sporadically used illegal substances at this CT Page 7381 point.
T.W.'s criminal history in Connecticut began in 1995. After an August 5, 1995 arrest, she was convicted in April, 1996 of larceny, and placed on probation. Exh. 4. A December, 1995 arrest resulted in a conviction for assault. As noted, she was arrested for violating probation in September, 1996, resulting in a conviction and incarceration. After an October, 1997 arrest, she went to jail for forty-five days on another larceny conviction. Id.
Soon thereafter, her fourth arrest, in February, 1998, led to yet another larceny conviction and one for failure to appear, resulting in a sentence of ninety days incarceration. This was followed by an arrest in September, 1998 and conviction in October, 1998 for possession of drug paraphernalia, with a jail sentence of thirty days. Id.
This pattern continued with an arrest on April 2, 1999 for assault, which was promptly followed with an April 11, 1999 (one day before the petition was filed) arrest for larceny and assault. These two April, 1999 arrests resulted in convictions for the above-listed offenses and a prison sentence of nine months, imposed in September, 1999. Exh. 4. Thus, from August, 1995 to April, 1999 she accumulated eight arrests, plus the probation violation, all of which led to convictions, and several of which resulted in incarceration.
In 1999, T.W. reported that she had been married. As of the filing of the petition, she was not employed. There is no evidence to the effect that she became employed subsequently.
C. The Father
Due to T.W.'s unwillingness to name Michael's father, no investigation initially could be conducted to locate him. No biological father is listed on Michael's birth certificate. When she named a putative father in 1999, Aaron L. of Georgia, DCF conducted a diligent search, but could not find him. As noted, he was provided with notice of these proceedings by publication. Michael's rather has never come forward to play any role in his life.
D. Michael and His Progress in Foster Care
After being placed in foster care in Connecticut, Michael was placed with his maternal aunt, Althea F., in June, 1998, when Michael was about four years and eight months old. At that time, it was planned for Michael's guardianship to be transferred to her. Due to her divorce and desire to return to school, however, Althea F. requested Michael's CT Page 7382 removal from her home and he returned to Connecticut in January, 1999.
In early February, 1999, Michael was placed in the home of Elizabeth and Clifford K., who became Michael's foster parents. Elizabeth K. testified at trial. She was an impressive witness. Besides her husband and Michael, she lives with their two biological sons, ages seventeen and twenty, and an eight year old foster son.
In December, 1998, she was asked if she would take Michael, a five year old, into her home. Although she expected him to be "normal," he was a child who had, and still has, a number of special needs. He had a lot of problems with motor skills. He had eczema. He suffered chronic, nightly enuresis. Initially, she bathed and dressed Michael.
Michael has made great strides in Elizabeth K.'s home. They are very affectionate with one another and Michael gets along well with her sons and his foster brother. She described their home as one in which there is "a lot of love." Michael is comfortable there. Clearly, he is bonded to his foster family. He calls Elizabeth K. "Mimi" and tells her "I love you, you're a good Mommy." Michael has told her he wants to stay in her home "forever."
Elizabeth K. and her husband initiated getting counseling for Michael, which is discussed below. After over one year and four months with Elizabeth K., Michael's motor skills are developing and his enuresis is improving, to two or three times per week. He is learning to bathe himself.
For the first time since Michael has been with her, T.W. called Elizabeth K.'s home within a few days before trial. Elizabeth K. stated that Michael does not know his mother. While he was happy to talk to her, he was nonchalant about doing so. Occasionally, Michael will say that he misses his mother. In dealing with the question of Michael's long-term care and in view of the lack of permanency in the current context, Elizabeth K. has addressed Michael's concerns about the future by telling him that she will care for him until his mother gets well.
Recently, in February, 2000, Elizabeth K.'s husband had a heart attack, and he was hospitalized. She and her husband have not yet made a commitment to adopt Michael. With regard to long-term foster care, she emphatically stated that she and her husband want Michael to stay with them and remain part of their family. They would be happy to have Michael stay in their home.
Mr. Richard Schmukler, a licensed clinical social worker, also testified about Michael. He has provided therapy to many children with CT Page 7383 special needs over the past thirty years. He saw Michael weekly from April 1, 1999 to February, 2000, then every other week until May 3, 2000. Initially, his diagnosis of Michael was that he suffered from attention deficit hyper-activity disorder, enuresis, and a low-level, long term depression, which was significant, but not of major proportions. Michael had significant gaps in his fund of knowledge. Michael's concerns included fears about being moved from his current placement. He feels safe and secure in Elizabeth K.'s home. He is a child who needs constant attention and safeguarding due to his impulsivity. of concern were safety issues, such as crossing the street without looking and becoming attached to people he did not know.
In therapy, Mr. Schmukler addressed the issues of loss and abandonment in Michael's life. He had a sense of insecurity about his base of support. After all, with the K. family, he was in his fourth living situation at the age of five.
When speaking to his therapist, Michael would indirectly and only occasionally refer to his mother. He was concerned about her getting well. Part of the goal of therapy was to help Michael understand he had no control over helping his mother.
Michael referred to his mother by her first name and did not refer to her as his mother. Ms. Morabito, a former DCF social worker, testified that, with regard to Michael's awareness of his mother's need to recover, he said that she would not do it.
He views his foster parents as his psychological parents, without question. They are his primary care-givers and primarily are the source of his adult emotional and physical support; secondarily, his school provides support.
According to Mr. Schmukler, if Michael were to be moved again, it would probably cause a serious regression in his mental health, in his behavior, and in his overall functioning. He would suffer de-compensation. The K. family is very good at reading Michael's sadness.
By the end of his therapy, Michael had made significant progress. He no longer had many safety issues. He was doing much better in school. His overall outlook on life and his behavior were improved. The dominant theme of sadness and anxiety remained. While all of his issues were still present, they were reduced.
Ms. Morabito stated that DCF's plan is for Michael to remain with the K. family. This was reiterated to her recently as the current plan. CT Page 7384
E. Efforts at Reunification and Rehabilitation
1. Keeping appointments and whereabouts known
T.W.'s record of keeping appointments set by or with DCF and keeping her whereabouts known was poor. Frequently during Michael's extended stay in foster care, DCF did not know where she was. Ms. Morabito, the former DCF social worker, who was assigned to the case from October, 1998 to August, 1999, had minimal contact with her. She tried to reach T.W. unsuccessfully by phone, and sent letters to her address which were returned. While she had the case, to her knowledge, T.W. sent no cards or gifts to Michael; on one occasion T.W. brought Michael a pair of sunglasses in a box.
T.W. frequently did not appear at court proceedings concerning Michael, despite offers of transportation by DCF. The dates of her failures to appear included November 18, 1996; April 21, 1997; August 4, 1997; October 9, 1997; and January 11, 1999. She never attended administrative case reviews concerning DCF's plans for Michael, even though transportation was offered. These dates included January 23, 1997; July 23, 1997; February 11, 1998; and January 17, 1999. In addition, she did not attend court-ordered psychological and parent-child interactional evaluations scheduled in March, July, and August, 1997. None ever occurred. Since Michael was placed, T.W. has not made inquiry of DCF concerning his health or his progress in school. She has not provided any financial support for his care.
2. Visitation
T.W.'s visits to Michael were sporadic at best. T.W. was requested to call if she wanted to visit. In 1996, after Michael was removed, she visited twice. In the entire year of 1997, including visits at prison and at a substance abuse treatment facility, only sixteen occurred. In 1998, before he left to go to Illinois in June, 1998, one visit occurred in March and one in April. Two visits occurred in 1999 after he returned to Connecticut, after which DCF terminated visitation, due to the court's determination that further reunification efforts were not appropriate.
During visits, mother stole toys on numerous occasions. She attempted to give Michael adult medication, behaved inappropriately with DCF staff, and indicated, in front of Michael, that he was being physically abused in foster homes.
Ms. Morabito observed the last two visits, in February and March, 1999. Michael was indifferent to his mother, even though she told him he CT Page 7385 would be home with her by his next birthday.
3. Substance Abuse Evaluations and Treatment
After September, 1996, DCF made various efforts at assisting T.W. in getting substance abuse treatment, but she consistently failed to address the issues. In October and November, 1996, she was offered services at Connecticut Renaissance, but she did not appear. In March, 1997, the court ordered a drug and alcohol assessment at Connecticut Renaissance. Exh. 7. The results were set forth in a Substance Abuse Evaluation, dated March 27, 1997. Exh. 3. Although she told the evaluator she last used cocaine one year previously, her urine test was positive for that drug, indicating more recent use. Id. at 2. She admitted smoking cocaine and marijuana. Id. In summary, T.W. presented herself "as a woman who is attempting to minimize a very serious problem with drug addiction." Id. at 4. Her drug problems had "impacted her physical health, ability to work, ability to care for her home, and her ability to care for her son." Id. A detoxification program was recommended, to be followed by in-patient treatment. A psychiatric evaluation was suggested as well. Id. The diagnosis included: cocaine dependence, alcohol abuse, dysthymic disorder, and poor nutrition. Id.
She was referred to Gunster for an in-patient program by the Department of Mental Health, but declined to attend in October, 1997. Upon release from prison in December, 1997, she went to the Liberation program but was unsuccessfully discharged after not returning from a leave on time. She was scheduled for another intake at this program in January, 1998, but did not attend, saying she was receiving treatment elsewhere. As reflected above, she had a larceny arrest soon afterwards in February, 1998, followed by another jail sentence. Other arrests and convictions promptly followed later in 1998 and 1999. There is no evidence indicating that T.W. ever successfully completed a substance abuse treatment program, let alone stopped using drugs.
In addition to the above discussed services, she was offered services through the NEON Family Enrichment Program, family support services, and counseling. As noted, intermittently she has been incarcerated. She never offered an appropriate plan for Michael's care.
ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court CT Page 7386 finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. § 17a-112
(c)(1). The court need not make such a finding, however, "if a court has determined at a hearing pursuant to subsection (b) of section 17a-110
[dealing with permanency planning for committed children] that such efforts are not appropriate." Id. The word "reasonable" is the "linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof." (citation and internal quotation marks omitted.) In re Amber B.,56 Conn. App. 776, 784 (2000). Our Supreme Court has found that "reasonable" is a term which varies according to its context and is synonymous with equitable, fair, and just, citing Webster's New International Dictionary (2nd Ed.). State v. Antrim, 185 Conn. 118, 122
(1981) (citations omitted). More recently, in the termination of parental rights context, the Appellate Court stated that "reasonable efforts means doing everything reasonable, not everything possible." (citations and internal quotation marks omitted) In re Savanna M., 55 Conn. App. 807,812-813 (1999); In re Jessica B., 50 Conn. App. 554, 566 (1998).
In accordance with § 17a-112 (c)(1), DCF may meet its burden concerning reunification in one of three ways: (1) by showing that it made such reasonable efforts; (2) by showing that the parent was unable or unwilling to benefit from reunification efforts; or (3) if the court previously determined that such efforts were not appropriate. By clear and convincing evidence, DCF has sustained its burden in each of these three ways as to T.W. As to Aaron L., DCF has shown, clearly and convincingly, that he was unable or unwilling to be involved in any way, let alone be reunified with Michael. In view of these circumstances, DCF could not make efforts as to Aaron L.
As part of its reasonable efforts, DCF provided T.W. with visitation and various referrals to facilitate reunification. She visited only sporadically. DCF made several referrals to assist her in addressing substance abuse. The March, 1997 evaluation by Connecticut Renaissance found that T.W. had a serious drug addiction problem. Instead of confronting it for the benefit of herself and her child, she continued a course of behavior marked by failing to complete any substance abuse program and repeated criminal convictions and incarcerations.
This pattern was compounded by her refusal to cooperate in a psychological evaluation, even though it was court-ordered. No follow-up recommendations for treatment could be made since no evaluation occurred. Rather than cooperate, T.W. thwarted this component of reunification efforts. Her refusal to be involved was further evidenced by her failures to appear in court and her lack of attendance at administrative case reviews. CT Page 7387
Reunification must be a joint effort to be successful. T.W. did not actively engage in the process when the opportunity for reunification was there for her. The statutory duty to make reasonable efforts to reunify does not oblige DCF to accomplish a successful result. In re Natalia G.,54 Conn. App. 800, 803 (1999). Efforts at reunification require a constructive response from the parent if they are to be meaningful. In reSavanna M., 55 Conn. App. 807, 813 (1999). Here, either due to her unwillingness or inability to diligently work towards reunification, T.W. did not so respond.
Thus, DCF has established that, under these circumstances, it made reasonable efforts to reunify T.W. with Michael, and that she was unable or unwilling to benefit from those efforts. Moreover, the court's earlier determination, in January, 1999, that reunification efforts as to herder no longer appropriate, was clearly correct, amply supported, and should not be disturbed. Without question, DCF has satisfied its burden of proof as to reunification.
B. Statutory Grounds
To prevail in a non-consensual termination of parental rights case, DCF must also prove by clear convincing evidence that one of several statutory grounds for termination exists. See In re Michael B.,49 Conn. App. 510, 512 (1998), cert. denied, 247 Conn. 919 (1998). Conn. Gen. Stat. § 17a-112 (c)(3).
DCF has alleged the grounds of abandonment and no ongoing relationship as to T.W. and Aaron L. It has also alleged failure to rehabilitate as to T.W. The court finds that DCF has proved each ground by clear and convincing evidence, except for the claim that T.W. abandoned Michael, which has not been so proved.
1. Abandonment
General Statutes § 17a-112 (c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Abandonment focuses on the parent's conduct. . . . A lack of interest in the child is not the sole criterion in determining abandonment." (citations and internal quotation marks omitted) In re Roshawn R.,51 Conn. App. 44, 52 (1998).
 The commonly understood general obligations of parenthood entail these minimum attributes: (1) CT Page 7388 express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance.
Id. at 53 (citations and internal quotation marks omitted).
"Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of a child." In re MigdaliaM., 6 Conn. App. 194, 208-209, cert. denied, 199 Conn. 809 (1986). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id. at 209. The statutory term "`maintain' implies a continuing, reasonable degree of concern." Id. at 210.
More than a merely sporadic showing of interest, concern or responsibility for the child is required by the statute. In re Shane P.,58 Conn. App. 244, 251 (2000); In re Angellica W., 49 Conn. App. 541, 551
(1998). The test is not limited to whether a parent has shown some minimal interest in the child. In re Juvenile Appeal (Docket No. 9489),183 Conn. 11, 14-15 (1981); In re Rayna M., 13 Conn. App. 23, 36 (1987). Statutory abandonment, as opposed to common law abandonment. does not require proof of an intention to abandon totally or permanently. In reShannon S., 41 Conn. Sup. 145, 151 (1989), aff'd per curiam,19 Conn. App. 20 (1989). Moreover, parental "interest" in the child is not the criterion for the determination as to whether abandonment has occurred; rather. the statute requires interest, concern and responsibility "as to the welfare of the child." In re Rayna M., supra,13 Conn. App. 36-37.
Formerly, § 17a-112 (and its predecessor (§ 45-61f(d)) required a one-year period for an abandonment finding. In re Juvenile Appeal(Docket No. 10155), 187 Conn. 431, 441 (1982). P.A. 98-241 eliminated this requirement.
The court is mindful that incarceration does not constitute abandonment. In re Michael M., 29 Conn. App. 112, 120 (1990). However, "it is also not a shield against a finding of abandonment" In re Danual,1997 Ct. Sup. 4239, 4249 (April 2, 1997) (Brenneman, J.). The restrictions of incarceration "do not excuse a failure to make use of available though limited resources for contact with a distant child." InCT Page 7389re Juvenile Appeal (Docket No. 10155), supra, 187 Conn. 443.
Petitioner has not provided clear evidence concerning this ground. Michael was placed in foster care in September, 1996. He was with his aunt in an out-of-state placement from June, 1998 to January, 1999, a period of approximately eight months. He then had two visits with his mother before DCF terminated visitation. Twenty visits by T.W. to Michael occurred between September, 1996 and June, 1998, a period of about twenty months, which amounts to an average of one per month. This was a small amount of interaction with Michael, a child with special needs.
During his lengthy period of placement, which, through the filing of the petition, in April, 1999, amounted to almost one-half of Michael's life, T.W. has not inquired of DCF about his health and well-being. Except for a pair of sunglasses, she has not provided gifts, cards, or financial support.
It is unclear to the court what actions may have been taken by T.W. to maintain contact with or demonstrate concern for Michael while he was placed with his aunt. This approximately eight month period represents a significant percentage of the time which elapsed between the uncared for adjudication in February, 1998 and the filing of the petition about fourteen months later. Petitioner has not sustained its burden to show, by clear and convincing evidence, that T.W. abandoned Michael. Accordingly, this ground is dismissed as to her.
Without question, since Michael's father has never come forward to play any role in Michael's life, abandonment has been proved, clearly and convincingly, as to Aaron L. He has done nothing at all by way of being a parent to Michael after his birth.
2. Failure to Rehabilitate
This statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(B). The court previously has found Michael to have been uncared for, thus satisfying a statutory prerequisite.
The rest of the statute requires the court to find whether the facts encourage the belief that "such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112
CT Page 7390 (c)(3)(B). This portion of the statute requires the court to analyze a parent's rehabilitation "as it relates to the needs of the particular child" and determine whether such rehabilitation is forseeable "within a reasonable time." In re Luis C., 210 Conn. 157, 167 (1989); In re HectorL., 53 Conn. App. 359, 366-67 (1999).
 `Rehabilitate' means `to restore [a handicapped or delinquent person] to a useful and constructive place in society through social rehabilitation.' [Webster's] Third New International Dictionary. The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems. In requires the court to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of what which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life.
(internal quotation marks and citations omitted.) In re Eden F.,250 Conn. 674, 706, motion for en banc re-argument denied, 251 Conn. 924
(1999).
As the Appellate Court recently noted In re Sarah Ann K.,57 Conn. App. 441, 448 (2000), the critical issue is whether the parent "has gained the ability to care for the needs of the particular child at issue." (internal quotation marks and citation omitted.) At the adjudicatory phase, the question is whether T.W., was better able to be a parent to Michael when the petition was filed than at the time of his commitment. See In re Michael M., 29 Conn. App. 112, 126 (1992). As noted, the petition was filed on April 12, 1999, one year and two months after the uncared for adjudication on February 9, 1998.
This type of inquiry "require[s] the court to obtain a historical perspective of the respondent's child caring and parenting abilities." Inre Sarah Ann K., supra, 57 Conn. App. 449. Based on the foregoing discussion, the evidence is clear and convincing that T.W. is not able to assume a responsible position in Michael's life, nor could she become able to do so within a reasonable time. The foregoing discussion concerning T.W.'s lack of effort toward reunification, supra, at 11-12, is relevant here as well and need not be repeated.
The evidence is overwhelming that T.W. did not comply with the court's CT Page 7391 Expectations and that she was not rehabilitated. The central issues were her drug addiction and mental condition. She failed to complete any substance abuse program, then was unable to be contacted for significant periods. She failed to comply with the court's direction to submit to a psychological evaluation. which would have included an interactional component. Her mental condition went undiagnosed and untreated. She continued to be arrested and convicted for stealing and assault. She never established steady employment. She chose not to attend case reviews and court appearances where her child's welfare was being addressed. Her limited visits to Michael were marked by inappropriate behavior. As a result she was never able to progress to a schedule of frequent, unsupervised visits.
In this type of inquiry, § 17a-112 (c)(3)(B) requires the court to focus on the "needs of the particular child." While T.W. was making no progress toward rehabilitation, Michael's needs had to be met by others. The record reflects that he is bonded to his foster family. After therapy and after being in a loving foster home, his special needs remain to be looked after and cared for attentively. The court credits Elizabeth K.'s statement that Michael does not know his mother. There is no evidence on which to believe that T.W. is someone who has or could ever assume a responsible role in Michael's life.
The past must be seen as a basis for prediction of the future. In view of her failures to address the central issues in her life and her steady refusal to comply with court orders, there is no basis on which to believe that T.W. had been rehabilitated when the petition was filed. She did little to be available to Michael. She failed to avoid repeated incarceration. There is no reason to believe that she will be rehabilitated within a reasonable time. She cannot assume a responsible position in Michael's life, nor could she within the reasonable future.
3. No Ongoing Relationship
DCF also alleges that there are no ongoing parent-child relationships between Michael and either of his parents. To prove this ground, DCF must show the absence of "the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and [that] to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(D); In re Savanna M.,55 Conn. App. 807, 815 (1999). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence CT Page 7392 it has now been completely displaced." In re Juvenile Appeal(Anonymous), 181 Conn. 638, 645 (1980) (internal citation omitted). The decisive question is "whether the child has no present memories or feelings for the natural parent." Id. at 646. As the Appellate Court recently noted, "the feelings of the child are of paramount importance."In re Tabitha T., 51 Conn. App. 595, 602 (1999). "Feelings for the natural parent connotes feelings of a positive nature only." Id.
Clearly and convincingly, there is no ongoing relationship between T.W. and Michael within the statutory definition. Whatever relationship he had with her prior to the OTC has been lost. Fortunately, it has been displaced by the solid relationship established between Michael and his foster mother and other members of her family.
The court is persuaded that, while Michael has memories and feelings concerning T.W., these are not ones of a positive nature. As noted, the court credits the testimony of Elizabeth K., the person who knows Michael best, that he does not know his mother. At his last visits with her, he was indifferent to her.[5] She was "physically, emotionally and spiritually unavailable to the child as a parent figure." In re SavannaM., supra, 55 Conn. App. 816. Michael's former therapist convincingly stated that Michael's issues of sadness and anxiety remain. Occasionally, Michael has stated that he misses his mother and is concerned about her. Central to his therapy were the issues of loss and abandonment in his life, as well as his fear of being removed from his foster home. Now, he no longer has to become attached to strangers in order to seek love and support.
On this record, no "positive" memory or feeling is presented. To the contrary, the record is of a troubled, sad little boy whose mother no longer has a relationship with him. One can miss one's parent without having an ongoing relationship with him or her as contemplated by §17a-112 (c)(3)(D). In The Interests of Malik M., 1998 Ct. Sup. 11632, 11636, 11638 (October 16, 1998) (Quinn, J.). That is the case in Michael's situation as well.
Having found that there is no ongoing relationship, the court is required to determine whether it would be in Michael's best interest to allow additional time for one to be established. The factors to be considered include "(1) the length of stay with [his] foster parents, (2) the nature of [his] relationship with [his] foster parents, (3) the degree of contact maintained with the natural parent and (4) the nature of [his] relationship with [his] natural parent." In re Savanna M.,supra, 55 Conn. App. 816.
Applying these factors leads, clearly and convincingly, to the CT Page 7393 conclusion that no further time is warranted for T.W. to establish a positive relationship with Michael. Michael has been living with Elizabeth K.'s family since February, 1999, now over sixteen months. In that home he has found the nurturing and stability which every child needs. Elizabeth K. has demonstrated her commitment to him by keeping him with her despite his extensive special needs and through her husband's recent heart attack and hospitalization. Her clear preference is for Michael to remain with her. Michael's therapist's testimony convincingly established that that outcome is what Michael needs.
In sharp contrast, based on the foregoing discussion, it is evident that, notwithstanding her eleventh hour, just before trial, single phone call to Michael at Elizabeth K.'s home, T.W. has not maintained contact with Michael. Michael does not know her. Her demonstrated lack of commitment to him and her own unstable life have had deep-seated, negative consequences for Michael. Without question, his best interest would not be served by allowing more time for T.W. to inflict damage upon Michael.
In argument, T.W.'s counsel claimed that In re Jessica M., 217 Conn. 459
(1991), supported T.W.'s position on this ground. The court is unpersuaded, since the facts in that case differ markedly those present here. There, in contrast to T.W.'s situation, the mother, "after months of sobriety," sought increased and unsupervised visitation. Id. at 473. Likewise, according to a psychologist, there the child had an affectionate visiting relationship with her mother, and would suffer loss if she were never allowed to see her again. Id. at 473-474. Here, no such relationship was established. Likewise, in Jessica M., the mother "consistently planned for reunification." id. at 474, a factor which is absent here. DCF has sustained its burden and has established that a ground for termination exists based on no ongoing relationship between Michael and T.W.
As to Aaron L., no relationship was ever established between him and Michael. In view of the length and strength of Michael's relationship with his foster family and the lack of any contact between him and Aaron L., there is no reason to permit more time for such a relationship to develop. Clearly and convincingly, DCF has sustained its burden as to Aaron L. on this ground as well.
DISPOSITION OF THE TERMINATION PETITION
In the disposition phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat. § 17a-112
(c)(2); In re Juvenile Appeal (83-CD), 189 Conn. 276, 285 (1983). The CT Page 7394 court can consider all events occurring through the close of the disposition hearing. Practice Book § 33-5.
Because of the deleterious effects of prolonged temporary placement, "time is of the essence," for Michael. In re Antony B., 54 Conn. App. 463,476 (1999); In re Alexander V., 223 Conn. 557 565 (1992). The Appellate Court has "consistently held that to allow a child to languish in foster care is not in the child's best interest." In re Drew R.,47 Conn. App. 124, 131 (1997). Our Supreme Court has noted that "long-term stability is critical to a child's future health and development." (citation omitted) In re Eden F., 250 Conn. 674, 709, motion for en banc re-argument denied, 251 Conn. 924 (1999).
In their closing arguments, all counsel agreed that it was in Michael's best interest to remain with Elizabeth K.'s family. His guardian ad litem spoke in favor of this outcome as well. Where they differed, however, was as to whether termination of parental rights was in his best interest. Petitioner and Michael's guardian ad litem sought termination and, if they were not willing to adopt Michael, long-term foster care for Michael with the K. family.
T.W.'s counsel and Michael's counsel argued against termination, asserting (1) it was not clear that the K. family will adopt Michael, (2) he could be moved from their home to his detriment; and (3) Michael wanted to maintain contact with his mother. In view of this situation, since Michael is currently safe, T.W.'s counsel claimed that this proceeding had no purpose. Michael's counsel contended that the one constancy in Michael's life was knowing that his mother was out there somewhere.
The court has discussed certain aspects of Michael's best interest above, at 20-21, in connection with the ground of no ongoing relationship. As noted, allowing his mother more time to harm Michael is not in his best interest.
Our Supreme Court recently has addressed the question of whether a clear plan for adoption is a prerequisite to termination.
 Although subsequent adoption is the preferred outcome for a child whose biological parents have had their parental rights terminated; (citations omitted); it is not a necessary prerequisite for the termination of parental rights. While long-term stability is critical to a child's future health and development; (citation omitted); adoption provides only one option for obtaining such stability. In this case, Eden's foster CT Page 7395 parents, despite hesitancy about committing themselves to adopting Eden, have indicated a willingness to provide Eden with a permanent foster home, assuming that such a placement is determined to be in Eden's best interest. In light of this testimony, the trial court reasonably could have concluded that the possibility of a permanent placement with Eden's current foster family was preferable to the continuing uncertainty of the status quo.
In re Eden F., supra, 250 Conn. 709-10.
As Eden F. indicated, few things in life are certain. In this case, although Elizabeth K. is currently hesitant about committing herself and her family to adopting Michael, she has not ruled it out. She clearly indicated that she would like Michael to remain with her family for the long-term. Under the circumstances here, either outcome for Michael, adoption by the K. family or long-term foster care with them, is clearly in his best interest.
After all, based on the record before the court, the best thing that ever happened to Michael was his placement in Elizabeth K.'s family. Finally, after being uncared for by his mother, and after a failed placement with his aunt, his welfare is being looked after by a family who has his long-term best interest at heart.
For Michael, keeping the status quo of uncertainty by preserving T.W.'s rights would be unfair. Through termination, even if the result is long-term foster care with the K. family, Michael can be aided in combatting one of his main fears, that he will be removed from their care. His mother has shown no sustained interest in contacting him. If she does so, it will be to up to Elizabeth K. as to whether to permit such contact.
Termination also has the benefit for Michael of permitting the K. family to adopt him. If termination were denied then it would not be possible. In addition, termination would preclude a possible future effort by T.W. to seek transfer of his guardianship. Leaving him at risk for such an eventuality would open the potential for fueling Michael's fear of removal. Under such circumstances, he would once again have to be involved in the court process, which may lead to exacerbation of his anxiety and other deterioration.
The evidence is clear and convincing that termination is in Michael's best interest. For good reasons, he has not been in his mother's care since September, 1996, now over three-and-a-half years. She squandered CT Page 7396 the opportunity to be a parent and emotionally scarred her son. His putative father, Aaron L., has never been involved in his life. Since early 1999, Michael has been in a loving, supportive foster home. Now, he has a good chance for permanency in that home. Since he is entitled to permanency and since time is of the essence, termination is in his best interest.
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17-112, [17a-112], (d). See In re Tabitha P., Conn. App. 353, 362 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the court finds that DCF provided foster care for Michael and services to T.W. of most importance, she was provided with referrals for substance abuse evaluations and treatment opportunities, as well as scheduled psychological evaluations. Due to his unavailability, no services could be offered to Aaron L.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF made reasonable efforts to reunify Michael with T.W. Such efforts became futile and inappropriate due to her inability or unwillingness to benefit from them. Due to his unavailability, DCF could not make efforts to reunify Aaron L. with Michael.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
Based on the foregoing discussion, the court finds that T.W. failed to comply with key elements of the court-ordered Expectations, the terms of which were described supra at 2. The extent of her lack of compliance is discussed above at 8-10, and 17-18. DCF complied with its obligations as to her. No Expectations could have been ordered as to Aaron L.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person who has exercised care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties. CT Page 7397
Based on the foregoing discussion, the courts finds that Michael is bonded to his foster parents, and their children. His foster parents are the primary source of love and support in his life. He does not know his mother. He remains apprehensive about the possibility of having to leave his foster family. He is worried about his mother and occasionally misses her.
5) The age of the child.
Michael is almost six years and eight months old. He has lived the majority of his life in foster care.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that neither T.W. nor Aaron L. have made reasonable efforts to adjust her or his circumstances or conditions to make it in Michael's best interest to be placed with either of them in the foreseeable future. T.W. has not addressed the issues leading to her unstable life. Her condition and conduct have led to a pattern of criminal activity and incarceration. She has not maintained contact with Michael. Her record of doing so was limited when she was permitted to visit. While, after early 1999, she could not visit, she made no other effort to maintain contact by other communications or contributions or through communication with DCF or his foster parents. The single recent phone call is seen purely as an isolated incident.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
Based on the foregoing discussion, neither T.W. nor Aaron L. faced unreasonable interference from anyone or from economic circumstances. Their respective circumstances were the results of their own actions and failures to act.
CONCLUSION
CT Page 7398
1. Based upon the foregoing findings, the court determines that it is in the best interest of Michael W. for termination of parental rights to enter with respect to the mother, T.W., and the father, Aaron L. Accordingly, the court hereby grants the petition to terminate the parental rights of T.W. and Aaron L.
2. The court further orders that the Commissioner of DCF is appointed statutory parent to Michael W.
3. If Elizabeth K. and her husband are willing to adopt Michael, the court directs that they be considered.
4. Pursuant to Conn. Gen. Stat. § 46b-121 (b), if Elizabeth K. and her husband are not willing to adopt Michael, then, except for emergency reasons, DCF is hereby ordered not to move Michael from their home without court approval for one year from the date of the issuance of this Memorandum of Decision. In the event that emergency circumstances require his removal, then DCF shall file a report with the court no later than ten days following said removal explaining the circumstances and seeking the court's approval thereof.
5. The Commissioner shall file with the court no later than sixty days following the date of judgment a written report of efforts to effect permanent placement and file the further reports as are required by state and federal law.
It is so ordered.
BY THE COURT
 ROBERT B. SHAPIRO JUDGE OF THE SUPERIOR COURT